1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

D'ANDRE LETRAY GLASPY,

        Plaintiff,

      v.

KING COUNTY, AARON THOMPSON;
MARYLISA PRIEBE-OLSON; JOHN
PAVLOVICH; GEORGE IRELAND; BRIAN
TAYLOR; ZACHARY BRUBAKER; NICOLE
YARID; RICHARD HARRUFF; AND THE
CITY OF SEATAC,

        Defendants.

Case No._____

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

Plaintiff D'ANDRE LETRAY GLASPY, by his attorneys, Loevy & Loevy,

complain of Defendants KING COUNTY,  King County Sheriff's Deputy AARON

THOMPSON; King County Sheriff's Deputy MARYLISA PRIEBE-OLSON; King County

Sheriff's Deputy JOHN PAVLOVICH; King County Sheriff's Deputy GEORGE IRELAND;

King County Sheriff's Deputy BRIAN TAYLOR; King County Sheriff's Deputy ZACHARY

BRUBAKER; King County Medical Examiner NICOLE YARID; former King County

Medical Examiner RICHARD HARRUFF; and the CITY OF SEATAC, as follows:

**INTRODUCTION**

1.     Plaintiff D'Andre Glaspy's life was forever changed when a two-year old baby he treated as his own son died of an illness while in Plaintiff's care despite his best efforts to perform CPR and take other measures to prevent this tragedy.

2.     Plaintiff was not given the opportunity to grieve the loss of his "son" because, law enforcement and public medical officials—the Defendants here—immediately accused Plaintiff of killing the baby.

3.     No reasonable person would have thought that Plaintiff killed MHA, but, reflecting racial bias against a large Black man, Defendants accused Plaintiff of homicide and conducted their investigation into MHA's death with reckless disregard for the truth and aimed at falsely generating the notion that MHA died due to child abuse inflicted by Plaintiff.

4.     The allegations, based on false accusation and false evidence, upended Plaintiff's life and caused him to spend more than five years—*i.e.*, 1930 days, or 63 months—wrongfully imprisoned in the King County Jail before he was finally acquitted at trial and released.

5.     This action seeks redress for the damages Plaintiff suffered from his wrongful imprisonment resulting from Defendants' actions.

**JURISDICTION AND VENUE**

6.     Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and Washington law to redress Defendants' tortious conduct and the deprivation under color of law of his rights secured by the United States Constitution.

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

8.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and the events and omissions giving rise to his claims occurred here.

1

**PARTIES**

2

9.     Plaintiff D'Andre Glaspy, known by family and friends as Dre, is a resident of

3

the City of Auburn, Washington. Before his wrongful imprisonment Plaintiff worked as a cook

4

and, in his free time, like to engage in "rap battle" competitions.

5

10.     Defendant Aaron Thompson was, at all relevant times, a duly licensed King

6

County Sheriff Deputy. He engaged in the conduct complained of in the course and scope of

7

his employment and under color of law. He is sued in his individual capacity.

8

11.     Defendant MaryLisa Priebe-Olson was, at all relevant times, a duly licensed

9

King County Sheriff Deputy. She engaged in the conduct complained of in the course and

10

scope of her employment and under color of law. She is sued in her individual capacity.

11

12.     Defendant John Pavlovich was, at all relevant times, a duly licensed King

12

County Sheriff Deputy. He engaged in the conduct complained of in the course and scope of

13

his employment and under color of law. He is sued in his individual capacity.

14

13.     Defendant George Ireland was, at all relevant times, a duly licensed King

15

County Sheriff Deputy. He engaged in the conduct complained of in the course and scope of

16

his employment and under color of law. He is sued in his individual capacity.

17

14.     Defendant Brian Taylor was, at all relevant times, a duly licensed King County

18

Sheriff Deputy. He engaged in the conduct complained of in the course and scope of his

19

employment and under color of law. He is sued in his individual capacity.

20

15.     Defendant Zachary Brubaker was, at all relevant times, a duly licensed King

21

County Sheriff Deputy. He engaged in the conduct complained of in the course and scope of

22

his employment and under color of law. He is sued in his individual capacity.

23

16.     Collectively, Defendants Thompson, Priebe-Olson, Pavlovich, Ireland, Taylor,

24

and Brubaker are referred to as the "Defendant Officers."

25

Complaint – Page 3
Case No.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17.    At all times relevant to the events described in the Complaint, Defendant Richard Harruff was Chief Medical Examiner at the King County Medical Examiner's Office (KCMEO). He is sued in both his individual and official capacities. As the Chief Medical Examiner at the King County Medical Examiner's Office, Defendant Harruff acted as the chief policymaker with respect to King County as it relates to the polices, practices, and actions of the Medical Examiner's Office and, accordingly, his actions constitute those of both himself as well as the policy decisions of the County with respect to medical examinations, autopsies, and other areas under the ambit of the KCMEO.

18.    At all times relevant to the events described in the Complaint, Defendant Nicole Yarid was an associate medical examiner at King County Medical Examiner's Office. She is sued in her individual capacity.

19.    Collectively, Defendants Harruff and Yarid are referred to as the "Medical Examiner Defendants."

20.    The Defendant Officers and Medical Examiner Defendants are referred to as the Individual Defendants.

21.    Defendant County of King (hereinafter "King County") is a Washington municipal corporation, duly incorporated under the laws of the State of Washington. At all times relevant to the complaint, King County was an employer of each of the individually named defendants and the governing governmental body of the King County Sheriff's Department and the King County Medical Examiner's Office. King County is liable for all torts committed by individual defendants pursuant to the doctrine of *respondeat superior*. Additionally, King County is liable for violations of Plaintiff's rights caused by its own unconstitutional policies, practices, and customs including actions of individual defendants taken pursuant to those policies, practices, and customs during their investigation of Plaintiff.

Complaint – Page 4
Case No.

22.     Defendant City of SeaTac (hereinafter "City" or "SeaTac") is a Washington municipal corporation, duly incorporated under the laws of the State of Washington, who works with the King County Sheriff's Office to provide police services to the City of SeaTac. At all times relevant to the events described in the Complaint, each of the Defendant Officers acted as agents or employees of both SeaTac and King County. SeaTac is liable for all torts committed by the Defendant Officers pursuant to the doctrine of *respondeat superior*. Additionally, SeaTac is liable for violations of Plaintiff's rights caused by its own unconstitutional policies, practices, and customs including actions of individual defendants taken pursuant to those policies, practices, and customs during their investigation of Plaintiff.

## FACTUAL ALLEGATIONS

23.     Plaintiff Glaspy is a thirty-three-year-old native of the Seattle area.

24.     In 2017, Plaintiff was romantically partnered with TeAnna Ausler, and together they were a young, but economically poor, couple in their mid-20s trying to stay afloat while jointly raising MHA Ausler's 2-year-old baby that Plaintiff treated as his own son.

25.     When Ausler was at work or otherwise away, Plaintiff' served as MHA's primary caretaker and spent his days at home with MHA.

26.     Plaintiff was a loving and caring "father" to MHA and MHA's well-being, to Plaintiff, was one of the most important things to his own happiness and fulfillment in life.

### MHA's Underlying Medical Conditions Cause His Tragic Death

27.     On November 22, 2017, Plaintiff and Ausler brought MHA to Seattle Children's Hospital due to a rash on his face that required treatment.

28.     MHA was evaluated by the Suspected Child Abuse and Neglect (SCAN) team. The SCAN is program made up of specially trained clinicians and social workers who assess children admitted to the hospital for abuse and neglect. The SCAN team examined Moses and correctly determined that MHA had not been abused or neglected.

Complaint – Page 5
Case No.

29.     At the hospital, tests were conducted indicating MHA had other underlying medical issues, including evidence of a serious viral infection. MHA was discharged from the hospital on November 22, 2017.

30.     In the days that followed, the infection grew worse.

31.     On December 2, 20217, MHA developed a fever and continued to show other evidence of pneumonia and viral infection, including aching legs and body aches.

32.     This infection ultimately caused the death of MHA's skeletal muscle tissue.

33.     The next morning, MHA was slow waking up, and more lethargic than normal, and obviously sick.

34.     In the days between MHA's treatment at the hospital and December 3, 2017, Plaintiff did not abuse MHA in anyway.  None of MHA's family or other caregivers noticed any signs of abuse.

35.     Ausler went to work on the morning of December 3, 2017.

36.     Plaintiff and MHA "facetimed" with Ausler's mother, who noted MHA's sickness (but recognized that MHA had not been abused).

37.     Plaintiff prepared MHA for a bath due to MHA having an unusually large (and stinky) bowel movement.

38.     In so doing, Plaintiff stepped out of the bathroom for a moment to grab his phone.

39.     In the interim, the underlying infection that had been building for a week became fatal. MHA passed out in the bathroom while Plaintiff grabbed his phone.

40.     Plaintiff discovered MHA passed out and immediately began to render aid, including attempting a cold shower to wake the baby, and then by performing CPR.

41.     Plaintiff frantically called 911, and the operator gave Plaintiff instructions to perform CPR, including twice instructing Plaintiff to "push down as hard as you can" in

between performing rounds of 30 chest compressions and 2 rescue breaths while waiting for EMS to arrive.

42.     Despite Plaintiff's attempts to perform lifesaving measures, MHA died from his underlying viral infection that had been building for days.

43.     Plaintiff's attempts to resuscitate MHA caused injuries to MHA common with the administration of CPR by laypeople, and particularly of the administration of CPR to small children by large adults.

44.     These injuries were obviously consistent with CPR, particularly given the instruction from 911 for Plaintiff to push hard on MHA's chest.

45.     The CPR Plaintiff performed on MHA, caused injuries to MHA that were not there before the fact and that were not—in any way—from abuse.

46.     It was too, late, regardless. Plaintiff could not have provided any amount of CPR could have stopped the pathological process of MHA dying that morning.

47.     When MHA died before Plaintiff's very eyes, it caused Plaintiff extreme distress, grief, and disbelief.

48.     Plaintiff did not abuse MHA that morning and did not commit a murder or any form of homicide against the baby that he loved and cared for. Plaintiff was in shock and heartbroken.

49.     By the time that medics arrived, MHA was deceased.

**Despite Obvious Evidence That MHA Died from an Underlying Medical Condition, and Not Abuse, Defendants Accuse Plaintiff of Homicide**

50.     Though MHA died in the City of SeaTac, the King County Sheriff's Department handled the investigation of MHA's death as part of the City's mechanism for providing law enforcement to the City. In this way, and during the investigation of MHA's death, the King

Complaint – Page 7
Case No.

1    County Sheriff's Deputies were acting as both agents of the City of Sea Tac and of King

2    County

3        51.    Rather than being treated as a grieving parent, Plaintiff was treated as a

4    homicide suspect.

5        52.    At the outset, the Defendant Officers accused Plaintiff of abusing MHA and

6    ignored evidence of Plaintiff's innocence. Indeed, Defendants knew Plaintiff himself had called

7    911 and been given instructions to provide forceful CPR.

8        53.    Despite this, the Defendant Officers began to accuse Plaintiff of being guilty

9    and fixated on mischaracterizing evidence of a medical condition (showing Plaintiff's

10   innocence) as if it were evidence of a homicide. This included mischaracterizing Plaintiff's

11   interactions with them, how the apartment appeared when they arrived, and exaggerating what

12   they observed.

13       54.    These misleading and untrue actions included: affirmatively and falsely

14   mischaracterizing statements Plaintiff made in grief at the apartment as inculpatory statements;

15   by making statements regarding the crime scene and physical condition of MHA that they

16   knew to be false or misleading, including about bloodstains and MHA's rectum;  by using

17   abusive tactics in questioning Ausler and Plaintiff just hours after MHA's death in a manner

18   they knew or should have known would yield unreliable evidence; and by attempting to elicit

19   false inculpatory statements from Plaintiff's family to suggest Plaintiff was violent and had

20   abused MHA and others even though the Defendant Officers knew they, and not the witnesses,

21   had suggested these things.

22       55.    But, that was all the point: the Defendant Officers did not and were not

23   conducting an honest investigation and, instead, rushed to accuse a poor, single Black man of

24   violence and killing a baby because of their assumptions about his race.

25

56.    The Defendant Officers' refusal to conduct an honest investigation—and their use of tactics that were abusive and likely to generate false information—was evident the day of MHA's death when Plaintiff was subject to lengthy, and disturbing, questioning and even subject to a "walk through" of the events that had transpired despite his obviously vulnerable emotional state. Having Plaintiff conduct a "walkthrough" or demonstration of the final moments of MHA's life was unconscionable.

57.    Yet, despite the Defendants' conduct, Plaintiff complied with all requests and was fully cooperative with their investigation. In interacting with Plaintiff for hours and hours in the aftermath of MHA's passing, the Defendant Officers knew—and certainly should have known—that Plaintiff had not committed a homicide against MHA.

58.    The Defendant Officers' questioning of Ausler was in a similar vein: it was extremely soon after MHA had died, in the face of grief, and involved suggesting Plaintiff committed a homicide rather than a search for the truth.

59.    Treating the parents of a deceased baby in this manner—when they should have been left to grieve their loss—was unconscionable.

60.    The Individual Defendants (the Defendant Officers and the Medical Examiner Defendants) worked together to falsely accuse Plaintiff of murder, labeling MHA's death a homicide even though it was not. The Individual Defendants (the Defendant Officers and Medical Examiner Defendants) discussed the circumstances of MHA's death and were all aware that Plaintiff had not only called 911 but also attempted extensive efforts to save MHA's life to no avail.

61.    The Defendant Officers and Medical Examiner Defendants knew, and should have known, that MHA's death was not a homicide but agreed jointly to accuse Plaintiff of homicide.

62. Defendant Yarid conducted the autopsy of MHA, which some of the Defendant Officers attended.

63. The circumstances of the 911 call, the medical history involving MHA's treatment by Seattle Children's Hospital a week prior (including the SCAN team's finding of no abuse), and the results of the autopsy were shared among the Individual Defendants.

64. Despite the written report suggesting otherwise, the autopsy itself confirmed that MHA died due to a viral infection and evidence of the virus was present in many aspects of MHA's vital organs, including through pneumonia in the lungs, inflammation in the liver, and necrosis in the skeletal muscle (which caused the leg pain the evening before).

65. Indeed, in a departure from established procedures, the Medical Examiner Defendants failed to perform tests that would have further illustrated and confirmed the significance of MHA's infections (which would have would have shown a medical pathology over days and confirmed that MHA did not die to being abused).

66. A reasonable medical professional would have realized, given the extent of the evidence of severe infection in MHA's vital organs that the cause of death was the underlying infection; *i.e.*, a flu in the lungs that had required treatment for over a week and that led to a cardiac arrest.

67. For example, muscle necrosis, for example, is evidence of viral infection that takes days to appear.

68. That pathology, when coupled with internal viral damage to the lungs and elsewhere in MHA body that was not (and could not have been) caused by abuse, was indicative of death due to a severe infection.

69. Indeed, MHA had evidence of infection in his muscles, lymph nodes, bowels, liver and lungs that could not have occurred in an acute event the morning MHA passed out and passed away.

70.     The severe viral infection and its impacts to his vital systems, caused MHA to "pass out" at the tub due to cardio-respiratory arrest. There is no medical evidence of homicide.

71.     However, consistent with their agreement with the Defendant Officers to implicate Plaintiff and having known that the Defendant Officers intended to accuse Plaintiff of homicide, Defendants Yarid and Harruff wrote the autopsy report and other documents in a manner that falsely dubbed MHA's death a homicide.

72.     In addition, Defendants Yarid and Harruff wrote the autopsy report in a manner that obscured, ignored, or mischaracterized the physical evidence that MHA had viral pneumonia, infection in his liver and elsewhere, and skeletal muscle necrosis that put him at increased risk of cardiorespiratory arrest.

73.     The radiological findings of MHA's brain provided results consistent with server infection alone, and that could not have been caused by abuse. The Medical Examiner Defendants did not report this exonerating fact in their reporting.

74.     At the time Yarid and Harruff wrote the autopsy report they knew that Plaintiff was being pursued by the Defendant Officers as a homicide suspect but knew that an ME finding the death was accidental or due to another cause (e.g., a viral infection that had been evident a week prior) would preclude Plaintiff from being prosecuted.

75.     Accordingly, after consulting specifically with the Defendant Officers and knowing that Plaintiff had performed CPR on MHA and had called 911 to report an emergency before his death, Defendants Yarid and Harruff agreed to write a report claiming MHA's death was a "homicide" even though they knew, and should have known, that this claim was untrue, ran contrary to the medical evidence, and was obviously unreliable.

76.     Defendants also ignored obvious evidence that Plaintiff had not killed MHA and that demonstrated they knew, or at least should have known, Plaintiff was innocent.

77.     For example, Defendants learned that Plaintiff "facetimed" MHA's grandmother around 30 minutes before Plaintiff called 911 but he did not have any signs of abuse and, instead, was still ailing (as he had been the night before). That call, and other evidence, showed that claims the Defendants would later make about injuries being inflicted the morning of December 3 were untrue.

**Defendants Cause Plaintiff to Be Charged With A Homicide He Did Not Commit (And That Did Not Happen)**

78.     At no time was there probable cause to believe that Plaintiff had murdered MHA or that MHA's death was a homicide.

79.     The Defendant Officers and Medical Examiner Defendants, however, wrote reports and other documents accusing Plaintiff of committing homicide or that they knew would be used to support that false allegation.

80.     In addition to the autopsy report authored by the Medical Examiner Defendants, the Defendant Officers authored other reports that included the mischaracterizations and falsehoods described above.

81.     Together, the Medical Examiner Defendants and Defendant Officers wrote a series of documents that were exemplary of racial bias against a Black man and that were motivated to falsely accuse Plaintiff of homicide despite evidence—and common sense—to the contrary.

82.     The Medical Examiner Defendants and Defendant Officers wrote their reports knowing they would be used to caused Plaintiff to be charged with a homicide and understood those reports would be relied upon by prosecutors and others in the criminal legal system to determine whether Plaintiff would be tried for a homicide.

83.     On the basis of the work by the Medical Examiner Defendants and Defendant Officers, Plaintiff was charged with homicide for killing MHA even though there was no probable cause to support those charges.

84.     The finding of probable cause was based upon evidence—including Defendants' report included falsehoods, misrepresentations, and that omitted material information of Plaintiff's innocence.

85.     In pursuing these charges, the Individual Defendants were aware of evidence showing Plaintiff's innocence—*i.e.*, that MHA's death was the result of an underlying medical condition—but pursued charges against him anyway.

86.     Plaintiff was arrested shortly after MHA's death in 2017 and imprisoned until 2023 awaiting trial.

87.     The basis for the charges was fabricated evidence, including the Individual Defendants' probable cause documents, police reports, and autopsy reports and documentation.

88.     At trial, these reports were used by the prosecution in preparing its case in presenting witness testimony and in cross-examining witnesses.

89.     At trial, these reports were used by the criminal defense attorneys in defending Plaintiff from the charges against him.

90.     Defendants' reporting impacted the criminal proceedings both in commencing the proceedings themselves, in pretrial proceedings, and during the trial itself.

91.     Fortunately, and despite the fabrications that caused Plaintiff to spend five years imprisoned, Plaintiff was acquitted of all charges.

92.     During the time between arrest and acquittal, Defendants were aware of evidence of Plaintiff's innocence but did not disclose it to the prosecutors or to Plaintiff's criminal defense attorneys.

93.     During the time between arrest and acquittal, the Defendants knew they had fabricated evidence, including in their own reports, but failed to disclose those dishonest acts to the prosecutors or to Plaintiff's criminal defense attorneys.

94.     During the time between arrest and acquittal, the Defendants knew they had targeted Plaintiff due to racial bias against Black men—and tropes about black men engaging in intimate partner violence and child abuse—to conclude and assert that Plaintiff committed a homicide when he had not.

### The Policies, Practices, and Customs of King County

95.     The King County Medical Examiner's Officer failed to exercise due care in labeling MHA's death a homicide knowing that Plaintiff would be charged with such a crime if they rendered that conclusion.

96.     The KCMEO had a duty to Plaintiff, and others, but breached that duty in asserting MHA's death was a homicide.

97.     Defendant Harruff, as policymaker for the County, ratified Defendant Yarid's actions (and autopsy report) and contributed to them himself.

98.     Indeed, Defendant Harruff has repeatedly included false contributing causes of death on autopsy reports things that are not contributing, and done so in a manner indicative of racial bias or a bias toward providing opinions that will aid criminal prosecution even when the factual basis is lacking.

99.     These practices were at work with Plaintiff.

100.     In addition, as it relates to the King County Sheriff's Department, the County has inadequate systems for ensuring officers engage in accurate reporting, in how to question witnesses following traumatic events, and in seeking the truth (and that permitted Plaintiff to be accused immediately). In the absence of adequate procedural safeguards, Plaintiff was

Complaint – Page 14
Case No.

1    wrongfully charged with a crime he did not commit (and that did not occur) due to the

2    County's practices and customs.

3                        **Plaintiff's Profound Damages**

4        101.    As a result of Defendants' misconduct, Plaintiff was arrested and charged with

5    Second Degree Murder for the death of MHA. Plaintiff spent more than five years imprisoned

6    before he was acquitted at trial of any involvement in MHA's death.

7        102.    In that time, Plaintiff's life was truly upended. He lost not only MHA but the

8    opportunity to truly grieve that loss. Plaintiff's loved ones—including Ausler and others in her

9    family—were turned against him as a result of the bogus accusations, pressure and influence

10   from the Defendants, and by the criminal charges.

11       103.    Defendants' actions caused Plaintiff the severe trauma of wrongful

12   imprisonment and the stress of charges hanging over his head for years, the loss of his liberty,

13   actual physical harm and pain, and reputational harm.

14       104.    Defendants' misconduct continues to cause Plaintiff physical and psychological

15   pain and suffering, humiliation, fear, nightmares, anxiety, depression, and despair, rage, and

16   other physical and psychological effects, and he has suffered emotional harm and great

17   anguish, which continues to this day.

18

19

20

21

22

23

24

25

## LEGAL CLAIMS

## COUNT I

### 42 U.S.C. § 1983 – Fourteenth Amendment Violation

105.    Plaintiff hereby repeats, realleges, and incorporates by reference each paragraph of this complaint, as though fully set forth herein.

106.    In the manner described more fully above, the Defendant Officers and Medical Examiner Defendants acted individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and his right to a fair trial.

107.    In the manner described more fully above, the Defendant Officers and Medical Examiner Defendants failed to disclose, and otherwise withheld and/or suppressed exculpatory information and material from the prosecution, Plaintiff, and Plaintiff's defense counsel during the criminal proceedings, including: evidence efforts to manipulate witnesses to falsely implicate Plaintiff despite knowing he was innocent; their own misconduct in coercing and fabricating evidence and testimony; and that they had fabricated information through mischaracterizations and material omissions in police reports, probable cause documents, in the autopsy report, and elsewhere.

108.    The Medical Examiner Defendants and Defendant Officers knew there was no credible evidence that Plaintiff committed a homicide, even as Plaintiff sat imprisoned in the King County jail and subject to criminal charges. Had they disclosed this exculpatory evidence, which would have shown no homicide was committed (and proved Plaintiff's innocence), it would have cast doubt on the entire police investigation and ongoing prosecution, and led to the end of Plaintiff's detention and prosecution.

109.    In addition, on information and belief, the Medical Examiner Defendants and Defendant Officers concealed and fabricated additional evidence that is not yet known to Plaintiff.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

110.     The Medical Examiner Defendants and Defendant Officers performed the above-described acts under the color of state law and within the scope of their employment when they took those actions, deliberately, intentionally, with malice or reckless disregard for the truth and of Plaintiff's rights and with deliberate indifference to Plaintiff's clearly established constitutional rights.

111.     As a result of the misconduct of the Medical Examiner Defendants and Defendant Officers Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

112.     In the manner described more fully below, the misconduct described in this count was undertaken pursuant to the policies and practices of Defendant King County and, for the Defendant Officers, the City of SeaTac.

## <u>COUNT II</u>

### 42 U.S.C. § 1983 – Fourth Amendment Violation:
### Prosecution and Detention Without Probable Cause

113.     Plaintiff hereby repeats, realleges, and incorporates by reference each paragraph of the complaint, as though fully set forth herein.

114.     In the manner described more fully above, the Medical Examiner Defendants and Defendant Officers, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth Amendment (made applicable to Defendants via the Fourteenth Amendment).

115.     In so doing, the Medical Examiner Defendants and Defendant Officers, caused

Plaintiff to be deprived of his liberty and detained without probable cause and subjected improperly to judicial proceedings for which there was no probable cause. Plaintiff was deprived of his liberty, after the issuance of legal process, based upon Defendants false and/or misleading documents and statements.

116.    Plaintiff obtained favorable termination of these criminal proceedings when he was acquitted at trial.

117.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally. In the alternative, the misconduct described in this count was also undertaken with malice

118.    As a result of Defendants misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

119.    In the manner described more fully below, the misconduct described in this count was undertaken pursuant to the policies and practices of Defendant King County and, for the Defendant Officers, the City of SeaTac.

## COUNT III
### 42 U.S.C. § 1983 – Fourteenth Amendment Denial of Equal Protection

120.    Plaintiff hereby repeats, realleges, and incorporates by reference each paragraph of the complaint, as though fully set forth herein.

121.    As described above, the Defendant Officers and Medical Examiner Defendants committed misconduct accusing Plaintiff of committing a homicide due, at least in part, to his race as a Black man who they immediately assumed was violent, had abused MHA, and had committed a homicide despite obvious evidence that he was a grieving father-figure who had tried to save MHA's life. These forms of racial bias animated Defendants' decisions to treat

injuries caused from CPR as evidence of homicide when it was evident that Plaintiff had performed CPR and tried to save MHA's life.

122.    As a result, the Defendants treated Plaintiff differently than they would have treated similarly situated individuals of other race and gender characteristics.

123.    Due to Defendants misconduct, Plaintiff was wrongfully accused, arrested, and prosecuted for crimes for which he is innocent (and that did not occur).

124.    In the manner described more fully above, the misconduct described in this count was undertaken pursuant to the policies and practices of Defendant King County and, for the Defendant Officers, the City of SeaTac.

## COUNT IV
### 42 U.S.C. § 1983— Failure to Intervene

125.    Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

126.    In the manner described above, during the constitutional violations described above, one or more of the individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

127.    These Defendants had a duty and reasonable opportunity to prevent this harm to Plaintiff, but they failed to do so.

128.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

129.    As a result of the individual Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

130.    In the manner described more fully above, the misconduct described in this

1    count was undertaken pursuant to the policies and practices of Defendant King County and, for

2    the Defendant Officers, the City of SeaTac.

3                                                **COUNT V**
                                    **42 U.S.C. § 1983 – Conspiracy**
4

5          131.    Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

6          132.    The Defendant Officers and Medical Examiner Defendants reached an

7    agreement among themselves to accuse Plaintiff of committing a homicide that he did not

8    commit (and that did not happen), and thereby to deprive Plaintiff of his constitutional rights,

9    as described above. This agreement was first reached before arresting Plaintiff, and it remained

10   in place throughout all periods of his wrongful detention, prosecution, and incarceration.

11         133.    In addition, the Individual Defendants agreed before Plaintiff's arrest, and

12   continued to conspire after he was charged and through various phases of his criminal

13   prosecution to deprive Plaintiff of exculpatory material to which he is entitled and that would

14   have led to his earlier release and exoneration.

15         134.    In this manner, the Individual Defendants, acting in concert with each other and

16   with other co-conspirators, known and unknown, conspired by concerted action to accomplish

17   an unlawful purpose and/or a lawful purpose by unlawful means.

18

19         135.    In furtherance of the conspiracy, each co-conspirator committed overt acts and

20   was an otherwise willful participant in joint activity.

21         136.    As a result of this illicit prior agreement, Plaintiff suffered loss of liberty, great

22   mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other

23   grievous and continuing injuries and damages as set forth above.

24         137.    The misconduct described in this count was objectively unreasonable and was

25

Complaint – Page 20
Case No.

undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

138.    In the manner described more fully above, the misconduct described in this count was undertaken pursuant to the policies and practices of Defendant King County and, for the Defendant Officers, the City of SeaTac.

## COUNT VI
## 42 U.S.C. § 1983 – *Monell* Claim

139.    Plaintiff hereby repeats, realleges, and incorporates by reference each paragraph of the Plaintiff incorporates each paragraph of this complaint as if fully restated herein.

140.    Plaintiff's injuries described in this complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of King County, as well as by the actions of policy-making officials for King County with respect to the KCMEO.

141.    At all times relevant to the events described in this complaint and for a period of time before and after, King County failed to promulgate proper or adequate rules, regulations, policies, and procedures governing: the conduct of officers in interacting with family members in the wake of tragedy, the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; honest and accurate reporting of autopsy results and opinions about cause and manner of death for the KCMEO; and the maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, King County failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of sheriff deputies, medical examiners, and

other agents of the King County Sheriff's Department and/or the KCMEO as to the same topics.

142.    King County has also adopted unwritten practices, despite its written policies, that allow deputies to use unreliable investigative methods and, in the KCMEO, that permit criminal accusations to be made against innocent civilians—and particularly Black suspects— that make its written guidance entirely ineffective.

143.    Had King County promulgated and enforced appropriate policies and practices, then the violation of Plaintiff's constitutional rights would have been prevented.

144.    These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of King Count directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting Plaintiff.

145.    The above practices and customs, so well settled as to constitute *de facto* policies of King County, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

146.    In addition, the misconduct described in this count was undertaken pursuant to King County' policies and practices in that the constitutional violations committed against Plaintiff were committed with the knowledge, approval, or endorsement of persons with final policymaking authority for King County or were actually committed by persons with such final policymaking authority.

147.     In fact, with respect to KCMEO, Defendant Harruff directly participated in the violation of Plaintiff's constitutional rights in his official capacity.

148.     As a consequence, the final policy makers for King County approved of, adopted, and therefore ratified the actions of the Individual Defendants, including their violations of Plaintiff's constitutional rights, making the County liable for this misconduct.

149.     Plaintiff's injuries and the constitutional violations he suffered were caused by officers, agents, and employees of King County, including but not limited to the Individual Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this count.

## COUNT VII— State Law
### Malicious Prosecution

150.     Each paragraph of this Complaint is incorporated as if reinstated fully herein.

151.     The Individual Defendants accused Plaintiff of criminal activity knowing those accusations were not supported by genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

152.     The Individual Defendants caused Plaintiff to be improperly subjected to criminal judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

153.     The Defendants' statements alleging that Plaintiff was guilty of homicide—and that a homicide even occurred—were made with knowledge that those statements were false. The Defendants also fabricated evidence in the form of falsified police reports, autopsy reports, and by how they interacted with witnesses.  The Defendants were aware, as described more fully above, that no true or reliable evidence implicated Plaintiff in having committed a homicide.

154.     In 2023, the prosecution terminated in Plaintiff's favor when he was acquitted at trial.

Complaint – Page 23
Case No.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

155.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

156.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to loss of liberty and emotional distress.

### Count VIII – State Law
**Outrage**

157.    Each paragraph of this Complaint is incorporated as if reinstated fully herein.

158.    The acts and conduct of the Defendants as set forth above were extreme and outrageous. As more fully described above, the Defendants' actions were rooted in an abuse of power and authority, and they were undertaken with intent to cause, or with reckless disregard for the probability that their conduct would cause, severe emotional distress to Plaintiff.

159.    The Defendants' conduct (including but not limited to their fabrication of evidence and subjecting Plaintiff to a "walkthrough" demonstration of the manner in which MHA died in an effort to frame Plaintiff for a crime he did not commit and that did not happen) were so outrageous in character and extreme in degree that they went beyond all possible bounds of decency and are intolerable in a civilized community.

160.    Defendants undertook this extreme and outrageous conduct intentionally and/or with reckless disregard for Plaintiff's emotional well-being.

161.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

### Count IX – State Law
**Civil Conspiracy**

162.    Each paragraph of this Complaint is incorporated as if reinstated fully herein.

163.    As described more fully above, the Individual Defendants, acting in concert, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

164.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

165.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to Plaintiff's rights.

166.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered injuries, including but not limited to loss of liberty and emotional distress.

**Count X – State Law**
**Respondeat Superior**

167.    Each paragraph of this Complaint is incorporated as if reinstated fully herein.

168.    In committing the acts alleged in the preceding paragraphs, each of the individual Defendants were members of, and agents of, the King County and the City of SeaTac, acting at all relevant times within the scope of their employment and under color of law.

169.    Defendants King County and the City of SeaTac are liable as principals for all torts committed by their agents under Washington law as set forth in the state-law Counts above.

**Count XI - State Law**
**Negligence**

170.    Each paragraph of this Complaint is incorporated as if reinstated fully herein.

171.    King County and the City of SeaTac owed a duty to Plaintiff to exercise reasonable care to refrain from causing him foreseeable harm. This included a duty to ensure their officers refrain from directly causing harm to Plaintiff through affirmative acts of misfeasance. Specifically, the Defendants owed Plaintiff a duty not to fabricate evidence, not to act based upon racial bias, and to avoid producing false allegations that would be used against Plaintiff in criminal proceedings. The Defendants also had a duty to ensure that adequate training and supervision was taken to prevent harm from Plaintiff. .

172.    King County and the City of SeaTac breached their duty to Plaintiff by failing to adopt safeguards, by failing to adequately train and supervise their officers, and as otherwise described above.

173.    But for the negligence of King County and the City of SeaTac, Plaintiff would not have been detained, charged, prosecuted, and wrongfully imprisoned for a homicide related to MHA's death.

174.    King County and SeaTac knew or reasonably should have known that the injuries Plaintiff suffered would result from the negligence described herein, which are obvious consequences that flow from the un-regulated and misguided work of Sheriff's deputies and, for King County, medical examiners. Plaintiff's wrongful prosecution and incarceration were within the field the danger which King County should have anticipated.

175.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to loss of liberty and emotional distress.

### Count XII– State Law
**Indemnification**

176.    Each paragraph of this Complaint is incorporated as if reinstated fully herein.

177.    In committing the acts alleged in the preceding paragraphs, the Individual Defendants acted at all relevant times within the scope of their employment for the City of SeaTac and/or or King County.

178.    As a result, pursuant to state law, the City of SeaTac and/or King County must indemnify the Individual Defendants for any judgment against them.

WHEREFORE, Plaintiff D'ANDRE LETRAY GLASPY respectfully request that this Court enter a judgement in their favor and against Defendants KING COUNTY; King County Sheriff's Deputy AARON THOMPSON; King County Sheriff's Deputy MARYLISA PRIEBE-OLSON; King County Sheriff's Deputy JOHN PAVLOVICH; King County Sheriff's Deputy GEORGE IRELAND; King County Sheriff's Deputy BRIAN TAYLOR; King County

Complaint – Page 26
Case No.

Sheriff's Deputy ZACHARY BRUBAKER; King County Medical Examiner NICOLE

YARID; former King County Medical Examiner RICHARD HARRUFF; and the CITY OF

SEATAC], awarding compensatory damages, attorneys' fees and costs against each defendant,

and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each

of the individual defendants, and any other relief this Court deems just and appropriate,

including but not limited to injunctive and equitable relief against the King County.

**JURY DEMAND**

Plaintiff, D'ANDRE LETRAY GLASPY, hereby demands a trial by jury

pursuant to Federal Rules of Civil Procedure 38(b) on all issues so triable.

Dated: March 13, 2026

Respectfully submitted,

David B. Owens

By:      /s/  David B. Owens

Loevy & Loevy
C/O
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
P.O. Box 85110, Seattle, WA 98145-1110

LOS ANGELES
333 S Grand Ave Suite 3310
Los Angeles, CA 90071

CHICAGO
311 N. Aberdeen St. 3FL
Chicago, IL 60607

Complaint – Page 27
Case No.